UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF IOWA
AT ROCK ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Case No. 22-cr-40028 |
| ) | |
| vs. ) | **DEFENDANT'S SENTENCING** |
| ) | **MEMORANDUM** |
| SCOTT WEST, ) | |
| ) | |
| Defendant. ) | |

COMES NOW Defendant Scott West, by and through his attorneys Andrea D. Jaeger of Keegan, Tindal, & Jaeger, and for his Sentencing Memorandum addressing the factors to be considered in imposing Defendant's sentence under 18 U.S.C. § 3553(a), states as follows:

## A. WITNESSES AND EXHIBITS

1. Defendant does not anticipate calling witnesses.

2. Defendant does not anticipate exhibits beyond any letters of support.

## B. OBJECTIONS TO THE PSR AND GUIDELINES ISSUES

3. No objections or PSR issues remain outstanding which affect the Guidelines.

4. Defendant persists in his objections as follows, none of which affect the Guidelines:

   a. Paragraph 19: Object to "West and Blank used the Samms account to target" and suggest revision to "the Samms account targeted." Such language is consistent with the Parties' language contained within the plea agreement. Defendant agrees both West and Blank subsequently used the Samms account with relation to MV1, and does not dispute the remainder of the Paragraph. Defendant notes an earlier sentence in Paragraph 19 indicating Blank, not Defendant, is the individual who knew MV1 through sports.

    b. Paragraph 25: Object to "MV2 was targeted by Blank and West via the Samms account" and suggest, consistent with the Parties' Plea Agreement, "MV2 was targeted via the Samms account." Defendant notes Paragraph 25 also reflects Blank was aware of MV2 through local sports, while Defendant was located in the United Kingdom and lacked the same connection. Defendant does not dispute the remainder of the paragraph.

### C. DEFENDANT'S CHARACTERISTICS AND "NEEDS" OF THE SENTENCE IMPOSED

5. Defendant respectfully requests the Court accept the Parties' Rule 11(c)(1)(C) agreement and sentence Defendant at the bottom of the range suggested by the (C) agreement, 384 months.

6. Defendant suggests lengthy incarceration, beyond the lengthy sentence of 384 months, is not necessary to promote respect for the law, to afford adequate deterrence, or to protect the public. 18 U.S.C. § 3553(a)(2)(A)–(C). Defendant admits his conduct and accepts responsibility for the same, and the circumstances of the offense and of Defendant's background suggest the parties' Rule 11(c)(1)(C) agreement provides an appropriate disposition in this case. The bottom of the (C) agreement range, 384 months (32 years), is sufficient, but not greater than necessary to do justice and achieve the goals of sentencing.

7. Defendant accepted responsibility for his conduct, forgoing his constitutional rights to force the Government to prove him guilty beyond a reasonable doubt in this matter. Defendant's conduct in entering a plea of guilty demonstrates lengthy incarceration, beyond the bottom of the Parties' negotiated Rule 11(c)(1)(C) agreement, is not necessary to promote the sentencing goal of respect for the law. Rather, Defendant has demonstrated his respect for the law by foregoing his rights and accepting the consequences, including a substantial sentence of a minimum of 32 years'

incarceration. Furthermore, because Defendant has entered a plea of guilty, and because the resulting sentence will be a substantial sentence of incarceration within the Bureau of Prisons, no further sentence beyond the (C) agreement is necessary to specifically deter Defendant, to advance interests in general deterrence, or to protect the public.

8. As always, Defendant respectfully suggests rehabilitation is a key consideration and should be of primary import at the time of sentencing. While Defendant acknowledges his first step will be at the BOP, rehabilitation is possible and should be a primary goal in determining an appropriate disposition. 18 U.S.C. § 3553(a)(2)(B)–(C). Examination of Defendant's personal characteristics and background suggest rehabilitation is possible and likely. Defendant has no scorable criminal history and has been a lifelong resident of the United Kingdom. *See* PSR ¶ 92. There, Defendant experienced a loving family and upbringing, including missionary work as a teenager. PSR ¶¶ 101–02. Upon reaching adulthood, Defendant remained close with his family, and Defendant continues to remain close to his prosocial support network despite his incarceration in a foreign country. PSR ¶¶ 103–04.

9. Defendant has, however, experienced personal struggle. As a teenager, Defendant struggled with the conflict between his personal identification and his "strong" religious beliefs shared by his family. PSR ¶ 109. This lead Defendant to experience depression, culminating in multiple suicide attempts. *Id.* This has remained untreated, although Defendant has affiliated himself with a new church which Defendant has found more supportive. *Id.* In 2023, Defendant's psychiatric interview indicated Defendant may continue to suffer and additional treatment would be appropriate. PSR ¶ 110. This treatment could be had in the BOP, and Defendant could learn additional tools to help cope with his mental health, in the time period of 32 years. A sentence greater than 32 years is not needed to provide necessary treatment in the most effective manner.

10. Nor is incarceration longer than 32 years necessary to treat serious substance abuse issues. Defendant does not present with substantial alcohol or other substance abuse or addiction. PSR ¶¶ 111–13. To the extent additional treatment and resources would be beneficial to Defendant, such could be obtained within the bottom of the (C) agreement period of incarceration.

11. Defendant has earned a college degree, and prior to incarceration, Defendant maintained legitimate, full-time, long-term employment. PSR ¶¶ 114–15, 117–19. In fact, at times, Defendant worked multiple jobs. PSR ¶¶ 117–19. A sentence greater than the bottom of the (C) range is not necessary to provide Defendant with additional vocational training.

12. Further, as detailed by more specifically by Judge Bennett in *Beiermann* and others, the Guidelines for sex offenses fail to reflect the Commission's role and fail to reflect the best resource for determining an appropriate sentence. Although the Parties have agreed to a (C) range of 32–42 years,[1] comparison to the advisory Guidelines remains an appropriate consideration for the Court. In making this comparison, however, criticism of the Guidelines, particularly in comparable cases, is worth noting.

13. As noted and found by the U.S. Sentencing Commission:

  a. A sentence within Defendant's asserted Guideline range results in an "odd[ ] of recidivism [ ] approximately 29 percent lower [as an offender sentenced to more than 120 months incarceration] compared to a matched group of federal offenders receiving shorter sentences." U.S. Sentencing Commission, LENGTH OF INCARCERATION AND RECIDIVISM (2022), available at https://www.ussc.gov/research/research-reports/length-incarceration-and-recidivism-2022 (accessed June 16, 2025).

---

[1] More precisely, 384–505 months.

      i. Here, the length of Defendant's sentence indicates a lower rate of recidivism.

b. "The typical production offender maintains a position of trust over the victim and has physical access to the child during the production of child pornography. Of the 512 child pornography production offenders sentenced in fiscal year 2019, 60.3 percent were related to or otherwise maintained a position of trust over the minor victim, whether through familial relationships or by virtue of the offender's role as a teacher or a coach, for example." U.S. Sentencing Commission, REPORT AT A GLANCE: FEDERAL SENTENCING OF CHILD PORNOGRAPHY, Production Offenses, available at https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-production-offenses (accessed June 16, 2025).

      i. Here, Defendant did not have a familial relationship nor a position of trust over the minor victims (dissimilar to Blank). Although this does not mean Defendant's offense was *de minimus*, it does lack, with respect to Defendant, some other common aggravating circumstance compared to comparable offenses and similarly situated offenders. Defendant suggests this consideration supports the recommended sentence of 32 years.

c. "The vast majority of fiscal year 2019 child pornography production offenders (80.9%) were sentenced for an offense that involved sexual contact of a minor." *Id.*

      i. Here, such indicates the circumstances of the offense are not atypical or significantly more aggravating when compared to comparable offenses and similarly situated offenders.

14. Offenses of this nature incite an emotional reaction: these crimes are viewed as repulsive and immoral. Setting aside emotional responses, however, the sentence in this matter must be based upon an evaluation of legal considerations, such as the goals of sentencing, and scientific research. Scientific research, however, indicates child pornography offenders have reduced rates of recidivism compared to other offenders.

15. Even the U.S. Supreme Court and Iowa Supreme Court have fallen victim to repeated misconceptions concerning sex offenses. In 2005, the Iowa Supreme Court dealt with an issue of first impression, the residency restrictions placed upon sex offenders. *See State v. Seering*, 701 N.W.2d 655, 664 (Iowa 2005). Upholding the restrictions, the court gave a nod to the hardships the restrictions placed on Keith Seering and his family, who had limited financial resources. But Seering's constitutional arguments were rejected because "the risk of recidivism posed by sex offenders is 'frightening and high,'" as "numerous authorities have acknowledged." The only authority cited for the judicial finding was Justice Kennedy's opinion in *Smith v. Doe*, 538 U.S. 84 (2003). Justice Kennedy's first statement on these issues arose in *McKune v. Lile*, 536 U.S. 24, 34 (2002), in which Justice Kennedy wrote the recidivism rate "of untreated offenders has been estimated to be as high as 80%." He further described such recidivism as "frightening and high." *McKune*, 536 U.S. at 34. In 2015, Professors Ira Ellman and Tara Ellman published "'Frightening and High' the Supreme Court's Crucial Mistake About Sex Crime Statistics." Constitutional Commentary, Vol. 30: 495. The article forensically examines the sources of Justice Kennedy's recidivism findings, which have risen to accepted judicial fact. Professor Ellman found the oft cited statistic was not a statistic at all. Rather, it was a bare assertion by a counselor in Oregon who ran a sex offender treatment program.

> He is a counselor, not a scholar of sex crimes or re-offense rates, and the cited article is not about recidivism statistics. It's about a counseling program for sex

> offenders he then ran in an Oregon prison. His unsupported assertion about the recidivism rate for untreated sex offenders was offered to contrast with his equally unsupported assertion about the lower recidivism rate for those who complete his program.

*Id.* at 498.

16.     Regardless of the validity of one's emotional reaction, sentencing is premised upon goals of rehabilitation in addition to mere retribution and punishment. Toward this end, sentences are to be tied out to specific goals and premised upon scientific research and logic. *See* 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."); *Kimbrough v. United States*, 552 U.S. 85 (2007) (Commission's usual practice was to develop Guideline sentences "using an empirical approach based on data about past sentencing practices, including 10,000 presentence investigation reports."). Examining research related to sex offenders, however, provides information contrary to the emotional reaction: sex offenders, like Defendant here, have exceptionally low recidivism rates. Further, the Guidelines for sex offense cases "[do] not exemplify the Sentencing Commission's exercise of its characteristic institutional role and empirical analysis, but was the result of congressional mandates, often passed by Congress with little debate or analysis." *U.S. v. Beiermann*, 599 F.Supp.2d 1087, 1100–04 (N.D. Iowa 2009) (J. Bennett) (collecting cases) ("I join my brethren who find that the child pornography guideline, U.S.S.G. § 2G2.2, which is the result of congressional mandates, is entitled to considerably less deference than other guidelines that *are* based on the Commission's exercise of its institutional expertise and empirical analysis. Perhaps in somewhat of a rush to appease the public's and politicians' noted and continued zeal for harsher sentences in child pornography cases, many courts have claimed that harsher sentences in child pornography cases will somehow reduce both the demand for and availability of child pornography on the Internet. I wish it were that simple.

… While the public's outcry for harsher sentences in child pornography cases is certainly understandable, there is not a single sliver of evidence in this sentencing record remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the internet. From the rapid growth of these cases that my colleagues around the country and I are seeing, we cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet. This does not mean that [defendant] should not receive a lengthy sentence for his criminal conduct, but it does mean that the sentence should not be longer simply to satisfy an objective that, while laudable, is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or course that I am aware of. … I find that U.S.S.G. § 2G2.2 should be rejected on categorical, policy grounds, even in a "mine-run" case, and not simply based on an individualized determination that it yields an excessive sentence in a particular case."). Because the Guideline applicable for this offense fails to reflect the Commission's role and fails to adequately take into account scientific research and goals of sentencing, variance is appropriate.

17.     The problems associated with CP Guidelines, and resulting overstatement of offense and likelihood of recidivism, is best exemplified by close examination of the use of a computer Guideline in particular. Guideline § 2G2.2(b)(6) provides a two-level enhancement "[i]f the offense involved the use of a computer of an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material…." USSG § 2G2.2(b)(6). Section 2G2.2, as a whole, is utilized for "Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, Soliciting, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; [and] Possessing

Material Involving the Sexual Exploitation of a Minor." USSG § 2G2.2. As the Court knows, this has been repeatedly applied by this and other courts, and repeatedly upheld by the 8th Circuit, while defendants repeatedly call for downward variance or other forms of relief. In a world where a cell phone, a car, a doorbell, a camera, a light switch, a thermostat, a microwave, and a seemingly infinite list of other objects is a "computer" within the scope of the Guidelines, it is difficult to imagine how an offense falling within the scope of § 2G2.2 could be utilized *without* a computer. To do so, it would seem individuals would be required to physically hand each other a literal scrapbook of child pornography, but this example is seemingly so outlandish in today's technological world, it feels somewhat comical or quaint. Moreover, even under such a hypothetical, one would have to question where the individuals obtained the CP to fill the supposed scrapbook. From a photographer's camera? Well, that would be a computer. From a cell phone camera? Again, computer. A polaroid?[2] Computer. Copying machine from some other unknown source that somehow does not qualify as a computer? Still a computer. Nicephore Niepce's 1816 camera? Computer![3] Having apparently exhausted all available means of producing a still or moving image, one would seemingly need to draw out the supposed CP, which of course would make it no longer CP.

18.    Enhancements are intended to be that: enhancements. As such, enhancements should apply when there is some atypical factor, usually aggravating, that is outside the norm, average, or run of the mill case. If a factor is no longer that—an atypical consideration not typically

---

[2] Polaroid, incidentally, is a brand—this would more appropriately be called an "instant camera."
[3] "the term 'computer' means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device." 18 U.S.C. § 1030(e)(1) (referenced by USSG § 2G2.1 (application note 1)).

otherwise found in similar cases—it should no longer be an enhancement (it should be the base) and the enhancement no longer serves its intended purpose. Continuing with this Guideline example, it is not the simple use of a computer, which would include the basic technology now found in all cell phones and vehicles (thermostats, doorbells, cameras…) and which appears to apply to every single offense under § 2G2.2, which itself makes some criminal activity more inherently evil or dangerous. *See, e.g.*, *U.S. v. Kramer*, 631 F.3d 900 (8th Cir. 2011) (cellphone constitutes a computer and the comparable enhancement under § 2G1.3(b)(3) applies); *cf. Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017) (finding statute prohibiting sex offender from accessing social media sites violated the First Amendment and, in doing so, discussing the importance of the internet in today's world). Application of the enhancement overstates the seriousness of the offense, unduly penalizes offenders without basis in today's world, fails to accurately reflect the likelihood of recidivism, and constitutes double counting with an enhancement that swallows the rule.

19. Other courts have acknowledged application of an enhancement for use of a computer makes very little sense in child pornography cases. *See, e.g., Beiermann*, 599 F. Supp. 2d at 1104–07 (collecting cases and authorities regarding USSG § 2G2.2, discussing the abandonment of the Commission's empirical analysis in child pornography cases, finding a categorical policy disagreement with the Guideline, and noting, in particular, the use of a computer enhancement, like virtually all the enhancements, impermissibly and illogically skews sentences even for "average" defendants to the upper end of the statutory range, regardless of other considerations, and fails to serve its stated purpose, which failure itself has been noted by the Commission). Stated otherwise, the purpose of a sentencing enhancement is to reflect the seriousness of aggravated facts which make the act more dangerous or harmful than the "baseline"

case established by a particular base offense level. But, an "ordinary" child pornography case involves the use of computers, because that is how humans communicate with each other and that is how one possesses child pornography: this enhancement "thus, blurs logical differences between least and worst offenders, contrary to the goal of producing a sentence no greater than necessary to provide just punishment." *Id.* at 1105.

20. Of course, the computer enhancement is only one; the overarching problems with CP Guidelines this enhancement illustrates apply to others as well. Application of the Guideline enhancement, like the Guideline as a whole, overstates the seriousness of Defendant's offense and results in an unreasonable sentence, warranting a variance.

21. Certainly, punishment is a valid sentencing consideration and sentencing justification. Respectfully, however, Defendant suggests punishment is only one sentencing goal and rehabilitation is a more important sentencing justification. In this matter, the bottom of the Parties' recommended (C) agreement calls for a sentence of 32 years. Defendant suggests 32 years is sufficient to support the goal of punishment.

22. As this Court is well aware, the Court can sentence below the Guidelines based solely upon policy disagreements with the Guidelines. *See e.g. Spears v. U.S.*, 555 U.S. 261, 263–67 (2009) (*per curiam*); *U.S. v. Kimbrough*, 552 U.S. 85, 109–110 (2007). "In Kimbrough the Supreme Court held that it is not an abuse of discretion for a district court to vary from the Guidelines based on its policy disagreement concerning the disparity between crack and powder cocaine sentences." *U.S. v. Battiest*, 553 F.3d 1132, 1137 (8th Cir. 2009). The United States Supreme Court has permitted trial courts to reject the guidelines on categorical policy grounds. Stated differently, there is no need for the sentencing court to make an individualized

determination an excessive sentence is yielded in a particular case. *U.S. v. Beiermann*, 599 F.Supp. 2d 1087 (citing *Spears*, 555 U.S. at 262).

23.    Here, the problems with CP Guidelines remain relevant sentencing considerations. Reliance on the CP Guidelines results in an unduly harsh sentence. Even the Commission has apparently acknowledged the problems with its own Guidelines. Therefore, a variance below Defendant's suggested Guideline calculation, to the Parties' (C) agreement range, is warranted, particularly when the Court notes Defendant's other personal characteristics and background, such as his lack of significant criminal history, his family and community support, his prosocial interests and connections, his history of gainful employment, and his genuine remorse, which will be addressed more fully at sentencing hearing.

### D. CONCLUSION

WHEREFORE Defendant respectfully requests he be sentenced in accordance with the foregoing.

Respectfully submitted,

*/s/ Andrea D. Jaeger*
Andrea D. Jaeger
Keegan, Tindal & Jaeger
2322 E. Kimberly Rd. Ste. 140S
Davenport, Iowa 52807
Telephone: 563-355-6060/319-887-6900
Facsimile: 563-355-6666/319-688-2754
Email: andrea@keeganlegal.com

**ATTORNEYS FOR DEFENDANT**

**Certificate of Service**

The undersigned certifies that the foregoing instrument was electronically filed on June 16, 2025, with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties to the above cause and to each of the attorneys of record herein at their respective addresses disclosed on the pleadings.

/s/ Andrea D. Jaeger